Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEXANDER TAI, Derivatively on Behalf of Nominal Defendants HAWAIIAN ELECTRIC INDUSTRIES, INC. and HAWAIIAN ELECTRIC COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT W. H. SEU, THOMAS B. FARGO, CELESTE A. CONNORS, RICHARD J. DAHL, ELISIA K. FLORES, PEGGY Y. FOWLER, MICAH A. KĀNE, MICHAEL J. KENNEDY, YOKO OTANI, WILLIAM JAMES SCILACCI, JR., TIMOTHY E. JOHNS, JAMES A. AJELLO, MARY E. KIPP, ALANA K. PAKKALA, TOBY B. TANIGUCHI, SHELEE M. T. KIMURA, KEITH P. RUSSELL, KEVIN M. BURKE, EVA T. ZLOTNICKA, MARY G. POWELL, ALAN M. OSHIMA, BERT A. KOBAYASHI, JR., JAMES K. SCOTT, KELVIN H. TAKETA, BARRY K. TANIGUCHI, JEFFREY N. WATANABE, CONSTANCE H. LAU, PAUL K. ITO, GREGORY C. HAZELTON, and TANYE S. Y. SEKIMURA,<br><br>Defendants,<br><br>and,<br><br>HAWAIIAN ELECTRIC INDUSTRIES, INC., and HAWAIIAN ELECTRIC COMPANY, INC.<br><br>Nominal Defendants. | **Case No:**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alexander Tai ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendants Hawaiian Electric Industries, Inc. ("HEI") and Hawaiian Electric Company, Inc.[1] ("HECO") (together "Hawaiian Electric" or the "Company"), brings this Verified Shareholder Derivative Complaint against Scott W. H. Seu ("Seu"), Thomas B. Fargo ("Fargo"), Celeste A. Connors ("Connors"), Richard J. Dahl ("Dahl"), Elisia K. Flores ("Flores"), Peggy Y. Fowler ("Fowler"), Micah A. Kāne ("Kāne"), Michael J. Kennedy ("Kennedy"), Yoko Otani ("Otani"), William James Scilacci, Jr. ("Scilacci"), Timothy E. Johns ("Johns"), James A. Ajello ("Ajello"), Mary E. Kipp ("Kipp"), Alana K. Pakkala ("Pakkala"), Toby B. Taniguchi ("Taniguchi"), Shelee M. T. Kimura ("Kimura"), Keith P. Russell ("Russell"), Kevin M. Burke ("Burke"), Eva T. Zlotnicka ("Zlotnicka"), Mary G. Powell ("Powell"), Alan M. Oshima ("Oshima"), Bert A. Kobayashi, Jr. ("Kobayashi"), James K. Scott ("Scott"), Kelvin H. Taketa ("Taketa"), Barry K. Taniguchi ("B. Taniguchi"), Jeffrey N. Watanabe ("Watanabe"), Constance H. Lau ("Lau"), Paul K. Ito ("Ito"), Gregory C. Hazelton ("Hazelton"), and Tanye S. Y. Sekimura ("Sekimura") (collectively, the "Individual Defendants" and together with Hawaiian Electric, "Defendants"), for and among other things, their breaches of fiduciary duties, unjust enrichment, gross mismanagement, waste of corporate assets, abuse of control, and violations of the Securities Exchange Act of 1934 (the "Exchange Act") which resulted in material damage to Hawaiian Electric and its stockholders.

---

[1] HEI's predecessor, HECO, was incorporated under the laws of the Kingdom of Hawai‘i on October 13, 1891. *See* 2010 Annual Report; https://www.sec.gov/Archives/edgar/data/354707/000119312510042821/d10k.htm#toc57217_4. As a result of a 1983 corporate reorganization, HECO became an HEI subsidiary and common shareholders of HECO became common shareholders of HEI. *Id*. Hawaiian Electric Industries, Inc. (HEI) is the sole holder of Hawaiian Electric Company, Inc. (Hawaiian Electric) common stock. *See* Third Quarter of 2023 Quarterly Report; https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000354707/000035470723000095/he-20230930.htm.

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hawaiian Electric, legal filings, news reports, actions filed against the Defendants including the personal injury and property damage class action *Eder, et al. v. Maui Electric Company, Limited, et al.*, 1:23-cv-00565-JAO-BMK (D. Haw.), the Maui County action, *County of Maui v. Maui Electric Company, Inc.*, 1:23-cv-00459-JAO-BMK (D. Haw.), and the securities class action *Bhangal v. Hawaiian Electric Industries, Inc. et al.*, case no. 3:24-cv-00598-JSC (N.D. Cal.) (the "Securities Class Action"), and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Hawaiian Electric against certain of its current and former directors and officers to remedy breaches of their fiduciary duties and other violations of law between at least February 28, 2019 and August 16, 2023 (the "Relevant Period") that have caused substantial harm to the Company.

2. Hawaiian Electric, among other things, together with its subsidiaries, provides energy services in Hawaii. HEI's electric utility, HECO, and its subsidiaries[2], supplies power to approximately 95% of Hawaii's population through the operation of five separate grids that serve communities on the islands of Maui[3], Molokaʻi, Oʻahu, Hawaiʻi, and Lānaʻi.

---

[2] HECO's subsidiaries include Maui Electric Company ("Maui Electric") and Hawaii Electric Light Company, Inc. ("Hawaii Electric Light").

[3] The County of Maui includes all of the island of Maui, along with other islands such as Lānaʻi, Kahoʻolawe, Molokini, and much of Molokaʻi.

3. Hawaiian Electric is subject to oversight from both federal and state regulators, including by the Hawaii Public Utilities Commission ("PUC"). Pursuant to General Order No. 7, the Standards for Electric Utility Service in the State of Hawaii, Part VIII Safety, Section 8.2 Protective measures, the PUC requires that Hawaiian Electric "exercise reasonable care to reduce the hazards to which its employees, its customers, and the general public may be subjected." Failure to comport with this requirement "shall be subject to a civil penalty not to exceed $25,000 for each day such violation, neglect, or failure continues." Haw. Rev. Stat. § 269-28(a).

4. As an electric utility company, it is key that Hawaiian Electric's transmission and distribution ("T&D") components—including the power generation plants, substations, transmission lines, and distribution systems—are maintained to be safe, reliable, and resilient.

5. The Individual Defendants knew the risks of failing to properly maintain the Company's T&D components. Therefore, the Individual Defendants are and were responsible for ensuring that the Company met all relevant regulations and that safety was ensured.

6. Throughout the Relevant Period, however, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, among other things, Defendants failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate; (ii) the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the Company did not properly maintain its equipment; (iv) as a result of the foregoing, Maui and its residents were at extreme fire risk which Defendants exacerbated; (v) as a result of the foregoing, the Company was at extreme financial, regulatory, legal, and reputational risk due to a its failures and any fire; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

7. On August 8, 2023, the deadliest wildfires in the United States in more than a century destroyed much of Lahaina, a former royal capital of Hawaii, along with other parts of Maui. Defendants' actions led to numerous lawsuits, including by the County of Maui which alleges, among other things, that "Defendants acted negligently by failing to power down their electrical equipment despite a National Weather Service Red Flag Warning on August 7th. The lawsuit further alleges HECO's energized and downed power lines ignited dry fuel such as grass and brush, causing the fires. The lawsuit also alleges failure to maintain the system and power grid, which caused the systemic failures starting three different fires on August 8th."[4]

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

---

[4] *8-24 County of Maui files lawsuit against HECO for civil damages caused by recent Maui fires*. August 24, 2023. https://www.mauicounty.gov/CivicAlerts.aspx?AID=12759.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

13. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Plaintiff is and was at relevant times a shareholder of Hawaiian Electric.

15. Nominal Defendant HEI is a Hawaiian corporation with principal executive offices located at 1001 Bishop Street, Suite 2900, Honolulu, Hawaii 96813. HEI's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HE."

16. Nominal Defendant HECO is a Hawaiian corporation with principal executive offices located at 1099 Alakea Street, Suite 2200, Honolulu, Hawaii 96813. HECO is a subsidiary of HEI.

17. Defendant Seu has served as HEI's President, Chief Executive Officer ("CEO"), and Director since January 2022. Defendant Seu served as President and CEO of HECO from February 2020 to December 2021.

18. Defendant Fargo has served as a Director of HEI since 2005. Defendant Fargo serves and has served at all relevant times as Chairman of the Board of Directors of HEI ("HEI Board") and Chairman of the Executive Committee of the Company, as well as a member of the HEI Board's Compensation & Human Capital Management Committee ("Compensation Committee") and the HEI Board's Nominating and Corporate Governance Committee.

19. Defendant Connors has served as a Director of HEI since 2019. Defendant Connors also serves as a member of the Audit & Risk Committee.

20. Defendant Dahl has served as a Director of HEI since 2017. Defendant Dahl served at all relevant times as a member of the Executive Committee, as well as a member of the HEI Board's Compensation Committee and the HEI's Board's Audit and Risk Committee.

21. Defendant Flores has served as a Director of HEI since 2021. Defendant Flores also serves as a member of the HEI's Board's Audit & Risk Committee.

22. Defendant Fowler has served as a Director of HEI since 2019. Defendant Fowler served at all relevant times as a member of the Executive Committee, as well as a member of the HEI Board's Compensation Committee and the Board's Nominating and Corporate Governance Committee.

23. Defendant Kāne has served as a Director of HEI since 2019. Defendant Kāne also serves as a member of the HEI Board's Compensation & Human Capital Management and Nominating & Corporate Governance Committees.

24. Defendant Kennedy has served as a Director of HEI since August 1, 2022.

25. Defendant Otani is and has been a Director HEI and member of the Board's Audit and Risk Committee since January 1, 2023.

26. Defendant Scilacci has served as a Director of HEI since 2019.

27. Defendant Johns has served as a Director and the Chairman of the Board of HECO ("HECO Board") at all relevant times.

28. Defendant Ajello has served as a Director of HECO and member of its Board's Audit and Risk Committee since 2020.

29. Defendant Kipp has served as a Director of HECO and member of its Board's Audit and Risk Committee at all relevant times.

30. Defendant Pakkala has served as a Director of HECO and as a member of its Board's Audit and Risk Committee since 2020.

31. Defendant Taniguchi has served as a Director of HECO and as a member of its Board's Audit and Risk Committee since 2021.

32. Defendant Kimura has served as the President and CEO of HECO since January 2022. Defendant Kimura also serves as a Director of HECO.

33. Defendant Russell served as a Director of HEI from 2011 to 2023.

34. Defendant Burke served as a Director of HECO from 2018 to 2023. Defendant Burke also served on the Company's Audit & Risk Committee.

35. Defendant Zlotnicka served as a Director of HEI from 2020 to 2021.

36. Defendant Powell served as a Director of HEI from 2019 to 2021.

37. Defendant Oshima served as the CEO, President, and a Director of HECO during the Relevant Period.

38. Defendant Kobayashi served as a Director of HECO during the Relevant Period.

39. Defendant Scott served as a Director of HEI during the Relevant Period.

40. Defendant Taketa served as a Director of HEI during the Relevant Period.

41. Defendant B. Taniguchi served as a Director of HEI during the Relevant Period.

42. Defendant Watanabe served as a Director and the Chair of HEI during the Relevant Period until May 2020.

43. Defendants Seu, Fargo, Connors, Dahl, Flores, Fowler, Kāne, Kennedy, Otani, Scilacci, Johns, Ajello, Kipp, Pakkala, Taniguchi, Russell, Burke, Zlotnicka, Powell, Oshima,

Kobayashi, Scott, Taketa, B. Taniguchi, and Watanabe are sometimes referred to herein as the "Director Defendants".

44. Defendant Lau served as President and CEO of HEI during the Relevant Period until January 2022.

45. Defendant Ito has served as Executive Vice President and Chief Financial Officer ("CFO") of HEI since January 2023. Defendant Ito served as Interim CFO of HEI from July 2022 until January 2023.

46. Defendant Hazelton served as Vice President and CFO of HEI during the Relevant Period until July 2022.

47. Defendant Sekimura served as Senior Vice President and CFO of HECO during the Relevant Period through September 2023.

48. Defendants Seu, Oshima, Lau, Kimura, Ito, Hazelton, and Sekimura are sometimes referred to herein as the "Officer Defendants".

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49. By reason of their positions as directors, officers, and/or fiduciaries of Hawaiian Electric and because of their ability to control the business and corporate affairs of Hawaiian Electric, the Individual Defendants owed Hawaiian Electric and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hawaiian Electric in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hawaiian Electric and its shareholders so as to benefit all shareholders equally.

50. Each director and officer of the Company owes to Hawaiian Electric and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hawaiian Electric, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52. To discharge their duties, the directors and officers of Hawaiian Electric were required to exercise reasonable and prudent supervision over the management, policies, controls, risks, and operations of the Company.

53. Each Individual Defendant, by virtue of holding the position of director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of Hawaiian Electric, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a violations of their obligations as directors and officers of Hawaiian Electric, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company (along with Hawaiian Electric customers). The conduct of the Individual Defendants who were also directors and/or officers of Hawaiian Electric has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

54. As directors and/or senior executive officers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth,

operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC the facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, the Individual Defendants had a duty to ensure the Company remained in compliance with all applicable laws.

55. To discharge their duties, the directors and officers of Hawaiian Electric were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hawaiian Electric were required to, among other things:

a. ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the State of Hawaii, the United States, and pursuant to Hawaiian Electric's own Corporate Code of Conduct (the "Code");

b. conduct the affairs of Hawaiian Electric in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. remain informed as to how Hawaiian Electric conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d. establish and maintain systematic and accurate records and reports of the business and internal affairs of Hawaiian Electric and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e. maintain and implement an adequate and functioning system of internal legal, financial, risk, and management controls, such that Hawaiian Electric's operations would comply with all applicable laws and regulations and Hawaiian Electric's financial statements and regulatory filings filed with the SEC and disseminated to the public would be accurate;

f. exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company disseminated;

g. refrain from unduly benefiting themselves and other Company insiders at the expense of Hawaiian Electric; and

h. examine and evaluate any reports, including examinations, audits, or other financial information, concerning the affairs of the Company and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth throughout this complaint.

56. Each of the Individual Defendants further owed to Hawaiian Electric and the shareholders the duty of loyalty requiring that each favor Hawaiian Electric's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57. At all times relevant hereto, the Individual Defendants were the agents of each other and of Hawaiian Electric and were at all times acting within the course and scope of such agency.

58. Because of their advisory, executive, managerial, directorial, and controlling positions with Hawaiian Electric, each of the Individual Defendants had access to adverse, non-public information about the Company.

59. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hawaiian Electric.

**THE COMPANY'S CORPORATE CODE OF CONDUCT**

60. The Company maintains a Corporate Code of Conduct, which includes a section to sign as an acknowledgement of receiving and reading the Code.

61. The Code states that it applies to the following individuals:

> ***This Code applies to all board members, executive officers, and employees,*** including part-time, contract, temporary employees, vendors, suppliers, and independent contractors to the extent that they are carrying out their duties ***with respect to any of the Companies (collectively "teammates") of Hawaiian Electric Industries, Inc. ("HEI") and all of its subsidiaries, including*** American Savings Bank, F.S.B. ("ASB" or the "bank"), ***Hawaiian Electric Company, Inc. ("Hawaiian Electric")***, Hawai'i Electric Light Company, Inc. ("Hawai'i Electric Light"), Maui Electric Company, Limited ("Maui Electric"), and Pacific Current, LLC ("Pacific Current"), collectively, "the Company", and individually "your Company".

(Footnote omitted.) (Emphasis added).

62. In the Code's section entitled "Our Shared Responsibility and Commitment", the Code describes its core values, which include:

> Safety.
>
> ***We put safety first for our teammates and community.*** We take responsibility for our personal safety AND the safety of our team.
>
> Aloha.

> We care about our teammates. ***We care about our community and everyone in it. We care about Hawai'i and its future.*** This means we will work together, treat each other with respect and dignity, ***take care of our environment, and give back to our communities***.

(Emphasis added.)

63. The Code includes a section entitled "Know the Code and Act with Integrity" which states:

> ***We each have a responsibility to know, understand and follow all Company policies, this Code, and applicable laws and regulations. Nothing can replace our sense of good judgment and integrity. Do the right thing, make ethical decisions, and never follow instructions you know to be illegal, unsafe or unethical.*** You are accountable for:
>
> • ***Following all laws and regulations and all Company policies and procedures, including department/operational procedures.*** …
> • Being truthful, fair, transparent, responsible and accurate with customers, regulators, suppliers, shareholders and other teammates. …
> • ***Protecting our reputation as a trusted local company.***
> • Reporting concerns and violations immediately.
> • Cooperating with investigations, compliance reviews and audits.

(Emphasis added.)

64. The Code includes a brief section entitled "Managing Risks" which states:

> ***One of our responsibilities under the Code is being aware of and addressing all types of risk that affect our work, such as business risk, compliance risk, and reputational risk.*** Be aware of these risks, take steps to address them, and raise the issue with the appropriate teammates if you identify any procedures, practices or situations that create risk to the Company and may need additional attention. Take full advantage of resources within your Company to help properly manage all business risks.

(Emphasis added.)

65. The Code includes a section entitled "Code of Ethics for Senior Financial Officers" which states, in relevant part:

> Compliance with Laws, Rules and Regulations

> ***As Senior Financial Officers, you must not only comply with applicable laws, rules and regulations, you also have leadership responsibilities with respect to demonstrating honesty and high ethical standards***, including ethical handling of actual or apparent conflicts of interest between personal and professional relationships, fostering a work environment that encourages employees to raise concerns and promptly addressing employee compliance concerns identified to you.
>
> Disclosures in Periodic Reports and Other Public Communications
>
> As a public company, HEI is required to file various periodic reports with the U.S. Securities and Exchange Commission ("SEC"). ***It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws, rules and regulations in the reports and documents that HEI files with or submits to the SEC and in other public communications made by HEI or its subsidiaries.*** The Company's Senior Financial Officers are expected to use their best efforts to perform their duties in a manner intended to implement this policy.
>
> * * *
>
> Reporting Violations and Accountability
>
> Potential or suspected violations of this Code of Ethics for Senior Financial Officers should be immediately reported to the HEI Board, the HEI President and Chief Executive Officer, the HEI Audit Committee or the HEI General Counsel. Senior Financial Officers will be held accountable for their adherence to this Code of Ethics for Senior Financial Officers. Any violations of this Code of Ethics for Senior Financial Officers shall be subject to discipline.

(Emphasis added.)

66. The Code also limits waivers of the Code for directors and officers as follows:

> ***Waivers of the Code for executive officers and members of the HEI, ASB, and Hawaiian Electric Board of Directors may be obtained only from the HEI Board of Directors.*** We actively monitor compliance with the Code and Code of Ethics for senior financial officers and ***waivers of the Code of Ethics for Senior Financial Officers may be obtained only from the Audit Committee of the HEI Board of Directors***. Any waivers of the Code will be disclosed promptly to the HEI Chief Financial Officer and the HEI Compliance Officer. Any waivers of the Code or amendments to the Code of Conduct for senior financial officers will be disclosed as required by applicable law, rule, regulation or listing standard.

(Emphasis added.)

## HEI'S AUDIT & RISK COMMITTEE CHARTER

67. HEI's Audit & Risk Committee Charter was in place at all relevant times and sets forth additional responsibilities on the members of the Audit & Risk Committee which consists of Defendants Connors, Flores, with Defendant Scilacci as the Chair. Such additional duties include assisting the Board oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function.

68. The Audit & Risk Committee Charter states that the Audit & Risk Committee shall have the responsibility and authority to, among other things:

E. <u>Risk Management and Compliance.</u>

1. ***Oversee the enterprise risk management program of the Company***, including by (a) reviewing and discussing the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, (b) discussing policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management is undertaken, and (c) periodically reporting to the Board the Committee's discussion and findings regarding risk oversight so the entire Board can be responsive to changes in the Company's risk profile.

2. Periodically review the Company's code of conduct (the "Code") and oversee the Company's program and procedures to monitor compliance with the Code, including meeting with the Compliance Officer to discuss potential Code violations that have been reported and the results of the Code compliance program and recommending to the Board proposed revisions to the Code.

3. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. The Committee has established the procedures set forth in Annex A to this charter.

(Emphasis added.)

69. The Audit & Risk Committee Charter also provides that the "Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities."

**HECO'S AUDIT & RISK COMMITTEE CHARTER**

70. HECO's Audit & Risk Committee Charter was in place at all relevant times and sets forth additional responsibilities on the members of the HECO Audit & Risk Committee which consists of Defendants Ajello, Kipp, Pakkala, Taniguchi, with Defendant Johns as the Chair. Such additional duties include assisting the Board oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function.

71. The HECO Audit & Risk Committee Charter states that the HECO Audit & Risk Committee shall have the responsibility and authority to, among other things:

> E. <u>Risk Management and Compliance.</u>
>
> 1. ***Oversee the enterprise risk management program of the Company***, including by (a) reviewing and discussing the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, (b) discussing policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management is undertaken, and (c) periodically reporting to the Board the Committee's discussion and findings regarding risk oversight so the entire Board can be responsive to changes in the Company's risk profile.
>
> 2. ***Provide input to the HEI Audit & Risk Committee regarding its periodic review of the code of conduct for HEI and its subsidiaries (the "Code") and oversee the Company's program and procedures to monitor compliance with the Code***, including meeting with the HECO Compliance Officer and the HEI Audit & Risk Committee to discuss potential Code violations that have been reported and the results of the Code compliance program for the Company.
>
> 3. ***Maintain the procedures established by the HEI Audit & Risk Committee*** and set forth in Annex A to this charter for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting

> controls or auditing matters and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

(Emphasis added.)

72. The HECO Audit & Risk Committee Charter also provides that the "Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities."

## SUBSTANTIVE ALLEGATIONS

### ***Materially False and Misleading Statements***

73. On February 28, 2019, Hawaiian Electric filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 Annual Report"). The 2018 Annual Report was signed by Defendants Lau, Oshima, Hazelton, Sekimura, Ito, Burke, Dahl, Fargo, Fowler, Johns, Kāne, Kobayashi, Russell, Scott, Taketa, B. Taniguchi, and Watanabe. As an overview of the Company's relevant business, the 2018 Annual Report stated, in pertinent part:

> *Electric Utility*. Hawaiian Electric and its operating utility subsidiaries, Hawaii Electric Light Company, Inc. (Hawaii Electric Light) and Maui Electric Company, Limited (Maui Electric), are regulated electric public utilities that provide essential electric service to approximately 95% of Hawaii's population through the operation of five separate grids that serve communities on the islands of Oahu, Hawaii, and Maui, Lanai and Molokai. Hawaiian Electric's mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy. The goal is to create a modern, flexible and dynamic electric grid that enables an optimal mix of distributed energy resources … demand response, and grid-scale resources to achieve the statutory goal of 100% renewable energy by 2045.

74. In discussing the Company's compliance with environmental regulations, the 2018 Annual Report stated, in relevant part:

> *Environmental regulation*. Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report … ***the***

> ***Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company [HEI] or Hawaiian Electric [HECO].***
>
> (Emphasis added.)

75. In discussing the Company's executive overview and strategy for its electric utility segment, the 2018 Annual Report stated, in relevant part:

> **Executive overview and strategy.** The Utilities provide electricity on all the principal islands in the state, other than Kauai, to approximately 95% of the state's population, and operate five separate grids. The Utilities' mission is to provide innovative energy leadership for Hawaii, ***to meet the needs and expectations of customers and communities***, and to empower them with affordable, reliable and clean energy. The goal is to create a modern, flexible, and dynamic electric grid that enables an optimal mix of distributed energy resources, such as private rooftop solar, demand response, and grid-scale resources to enable the creation of smart, sustainable, resilient communities and achieve the statutory goal of 100% renewable energy by 2045.
>
> (Emphasis added.)

76. Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lau, Hazelton, Oshima, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77. On March 25, 2019, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Watanabe, Lau, Dahl, Fargo, Fowler, Russell, Scott, and B. Taniguchi ("2019 Proxy Statement"). The 2019 Proxy Statement solicited, among other things: (i) the election of Defendants Connors, Fargo, Powell, Scilacci, and Watanabe to the Board; (ii) approval of the extension of the term of the Company's Nonemployee Director stock plan and increase the shares available for issuance thereunder; and (iii) approval of executive compensation.

78. The 2019 Proxy Statement contained the following statements by Defendant Watanabe, in relevant part:

> **Culture and Our Teammates**
>
> We are dedicated to creating a better Hawaii. We reflect this commitment through our efforts to provide products and services that enhance our customers' lives, and ***in our work to protect Hawaii's unique environment***, strengthen our economy, ***support our communities and act with integrity and accountability***.
>
> Our board oversees and works with management to find and cultivate the talent our organization needs to continue delivering value for our shareholders, customers and communities. ***Our employees are committed to the company's foundational values: integrity, excellence, aloha and safety*** …
>
> **Our Focus on Risk Oversight**
>
> The board spends a significant time on risk oversight. ***We have a board-approved consolidated enterprise risk management system designed to identify and assess risk across the HEI enterprise and report risks to the board***, along with proposed strategies for mitigating such risks. At least annually, the board conducts a strategic planning and risk review, during which we evaluate the company's fundamental financial and business strategies and assess major risks facing the company and options to mitigate those risks …

(Emphasis added.)

79. However, the 2019 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention plans and policies, and that the Company's procedures were inadequate to meet the challenges for which they were purportedly designed. Further, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. If shareholders knew these facts then they would not have approved the above-solicited proposals.

80. On May 7, 2019, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended March 31, 2019 (the "1Q19 Report"). The 1Q19 Report was signed by Defendants Lau, Hazelton, Oshima, and Sekimura. Attached to the 1Q19 Report were SOX

certifications signed by Defendants Lau, Hazelton, Oshima, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

81. On August 2, 2019, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended June 30, 2019 (the "2Q19 Report"). The 2Q19 Report was signed by Defendants Lau, Hazelton, Oshima, and Sekimura. The 2Q19 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 2Q19 Report were SOX certifications signed by Defendants Lau, Hazelton, Oshima, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

82. On November 1, 2019, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended for the quarter ended September 30, 2019 (the "3Q19 Report"). The 3Q19 Report was signed by Defendants Lau, Hazelton, Oshima, and Sekimura. The 3Q19 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 3Q19 Report were SOX certifications signed by Defendants Lau, Hazelton, Oshima, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

83. On February 28, 2020, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC for the year ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Lau, Seu, Hazelton, Sekimura, Ito, Burke, Connors, Dahl, Fargo, Fowler, Johns, Kāne, Kobayashi, Powell, Russell, Scilacci, Taketa, Watanabe, and Zlotnicka. The

2019 Annual Report contained substantively similar descriptions of the Company's business, compliance with environmental regulations, and executive overview and strategy of its electric utility segment, as relayed above.

84. The 2019 Annual Report, in addition to the substantially similar descriptions as the 2019 Annual Report, discussed the Company's environmental, social and governance ("ESG") risks and opportunities, stating in part:

> **Environmental, social and governance risks and opportunities.** Environmental, social and governance (ESG) considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii" for the benefit of all stakeholders. ***The Company firmly believes that effective management of its ESG risks and opportunities creates a strategic business advantage***; improves the lives of our employees, through focus on employee health, wellness, safety, empowerment and increased engagement; ***improves the sustainability, well-being and resilience of our communities, the state and the environment; and ultimately leads to sustained long-term value creation for our investors***.
>
> The HEI Board of Directors is responsible for the oversight of the Company's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations. The Board of Directors has delegated the day-to-day responsibility to execute on these action plans to management. ***The Company believes ESG considerations are embedded in our daily actions and drive how we engage with our employees, communities, and shareholders.***
>
> The Company intends to leverage the frameworks developed by the Task Force on Climate-related Financial Disclosure (TCFD) and the Sustainability Accounting Standards Board (SASB) to communicate our approach and progress on ESG matters in future filings.
>
> We are committed to achieving a renewable, sustainable energy future, providing leadership in corporate social responsibility, and adhering to governance best practices.
>
> (Emphasis added.)

85. Attached to the 2019 Annual Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of

any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

86. On March 26, 2020, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Watanabe, Fargo, Lau, Connors, Powell, Dahl, Russell, Fowler, Scilacci, Kāne, and Zlotnicka (the "2020 Proxy Statement"). The 2020 Proxy Statement solicited, among other things: (i) the election of Defendants Fowler, Russell, Zlotnicka, and Kāne to the Board; and (ii) approval of executive compensation.

87. The 2020 Proxy Statement contained the following statements by Defendant Watanabe, in relevant part:

> **Board Oversight of Strategy and Risk Management: Investing in Hawaii's Sustainable Future**
>
> ***Sustainability, or environment, social and governance (ESG), considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii." We firmly believe that effective management of ESG risks and opportunities creates a strategic business advantage; improves the sustainability, well-being and resilience of our communities, our state and our environment; and leads to sustained long-term value creation for our investors.***
>
> The Board is responsible for the oversight of HEI's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations. The Board has delegated the day-to-day responsibility to execute on these action plans to management.
>
> This past year, our Board prioritized integrating sustainability even further into our governance structures, decision-making processes and reporting. ***We focused our strategic retreat on climate change and other ESG factors relevant to our companies. Since then, the HEI companies have been further integrating climate change and ESG factors into strategic planning and ERM processes.***
>
> (Emphasis added.)

88. However, the 2020 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention plans and policies, the Company's procedures were inadequate to meet the challenges for which they were purportedly designed. Further, despite knowing the degree

of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. If shareholders knew these facts then they would not have approved the above-solicited proposals.

89. On May 5, 2020, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended March 31, 2020 (the "1Q20 Report"). The 1Q20 Report was signed by Defendants Lau, Hazelton, Seu, and Sekimura. The 1Q20 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 1Q20 Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

90. On August 6, 2020, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended June 30, 2020 (the "2Q20 Report"). The 2Q20 Report was signed by Defendants Lau, Hazelton, Seu, and Sekimura. The 2Q20 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 2Q20 Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

91. On September 15, 2020, Hawaiian Electric issued a press release entitled "HEI RELEASES FIRST CONSOLIDATED ENVIRONMENTAL, SOCIAL AND GOVERNANCE (ESG) REPORT" which stated, in relevant part:

> Hawaiian Electric Industries, Inc. (HEI) (NYSE: HE) today released its first consolidated report describing its policies, actions and performance data with respect

> to environmental, social and governance and sustainability-related matters. Such reports are frequently referred to as "ESG" reports and are becoming increasingly common as investors seek to understand how public companies are impacting the environment and society, as well as potential opportunities and risks to companies' long-term financial and operational strength.
>
> "***We're proud to issue our first consolidated HEI ESG report to help customers, employees, investors and other stakeholders understand how HEI's strategies and operations advance ESG outcomes and create long-term value for all stakeholders***," said Connie Lau, HEI president and CEO.
>
> "While this is our first consolidated HEI ESG report, ESG principles and sustainability have long been fundamental values of HEI, so much so that we've often said that ESG is in our DNA. ***With all of our operations in the middle of the Pacific Ocean, we know that our company' long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands.*** This linkage is all the more clear in the context of the COVID-19 pandemic, and we're working hard to help our customers, employees and communities through this period and to help our economy recover," said Lau.
>
> * * *
>
> Highlights in HEI's first consolidated ESG report include:
>
> …
>
> **Building resilience and managing climate change risk.** ***We're focused on managing and mitigating resilience risks presented by climate change.*** Our efforts include our utility's use of state-of-the-art climate analytics to inform its infrastructure plans and our bank's underwriting practices and ongoing monitoring of its loan portfolio with respect to sea level rise and flood-related risk. ***We're also working to engage our communities in critical discussions about resilience needs and emergency preparedness.***
>
> (Emphasis added.)

92. Also on September 15, 2020, Hawaiian Electric published its 2019 ESG Report. In discussing sustainability governance, the 2019 ESG Report stated:

> ***We see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation. As such, we've integrated material ESG factors into company governance structures and management activities. Just like other strategies and risks, we're identifying, measuring, managing and assigning accountability for material ESG issues.***
>
> Company strategies are overseen by the Board as a whole and are managed through our strategic planning and oversight process. The Board provides guidance on

> strategic priorities and plans, including at its annual strategic retreat, and approves the budget to allocate resources for agreed upon strategies.
>
> Our full Board reviews and provides input on major risks for our companies and determines our risk appetite. ***This includes risks relating to safety and potential physical risk to utility infrastructure or to bank loan collateral from climate change impacts.*** The HEI Audit & Risk Committee assists the Board in its risk oversight role by overseeing our Enterprise Risk Management (ERM) program, which is designed to identify and assess key risks across the HEI enterprise and report such risks to the Board, along with strategies for mitigating such risks. The Hawaiian Electric Audit & Risk Committee and the ASB Audit Committee and Risk Committee assist in risk oversight of those subsidiaries.
>
> The HEI Nominating & Corporate Governance Committee (NCG Committee) reviews strategies and risks involving governance and assesses leadership development and succession planning to ensure we have the right leadership to execute our strategies. The role of the NCG Committee has recently expanded to include review of human capital management and ensuring ESG oversight.
>
> (Emphasis added.)

93. The 2019 ESG Report further stated, in discussing environmental commitment and management, in relevant part:

> Our customers and communities expect that through our daily operations we will protect our air and water, reduce waste, and conserve natural resources. More than 30 environmental professionals, including scientists, engineers, chemists, and a wildlife biologist work full-time at our company to ensure that employees and external contractors understand and comply with all applicable environmental laws, regulations, permitting requirements and procedures regarding air and water quality, noise control, hazardous materials, and protected species.
>
> ***Our Environmental Division's mission is to ensure that the company fulfills its kuleana[5], responsibility, to protect Hawai'i's unique environment through environmental compliance and stewardship*** and timely, innovative, cost-effective Environmental Management Programs and Standard Operating Procedures, which are comprehensive and formalized.

* * *

---

[5] "Kuleana" is a Hawaiian word which means "right, privilege, concern, responsibility". "Hawaiian Word of the Week: Kuleana", *University of Hawaii News*, January 10, 2023, https://www.hawaii.edu/news/2023/01/10/hawaiian-word-of-the-week-kuleana/.

> ***Internal audits are conducted to verify compliance with environmental permits, regulations and policies, and fulfill corporate risk management requirements.*** Our internal Corporate Audit Team audits the Environmental Division at least once every three years. Audit reports are used to create Management Action Plans, ensuring that highest risk items are given priority and addressed in a timely manner. The Environmental Division also performs periodic environmental compliance audits of our company facilities to identify areas for improvement.
>
> (Emphasis added.)

94. The 2019 ESG Report, further stated, in discussing the Company's purported commitment to safety, in relevant part:

> ***Safety is our number one priority at Hawaiian Electric.*** Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.
>
> Our safety commitment is to provide and support:
>
> • ***Managerial responsibility for health and safety issues***
> • Procedures for hazard identification and safety risk assessment
> • Operating health and safety guidelines, procedures, and policies
> • ***Emergency planning and preparedness procedures***
> • Safety performance monitoring, measurement, and reporting
> • Internal and external health and safety audits.
>
> (Emphasis added.)

95. On November 6, 2020, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended September 30, 2020 (the "3Q20 Report"). The 3Q20 Report was signed by Defendants Lau, Hazelton, Seu, and Sekimura. The 3Q20 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 3Q20 Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

96. On February 26, 2021, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC for the year ended December 31, 2020 (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Hazelton, Sekimura, Lau, Seu, Ito, Ajello, Burke, Connors, Dahl, Fargo, Fowler, Johns, Kāne, Pakkala, Powell, Russell, Scilacci, Taketa, and Zlotnicka. The 2020 Annual Report contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed above.

97. Attached to the 2020 Annual Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

98. On March 26, 2021, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Fargo, Lau, Connors, Powell, Dahl, Russell, Fowler, Scilacci, Kāne, and Zlotnicka (the "2021 Proxy Statement"). The 2021 Proxy Statement solicited, among other things: (i) election of Defendants Dahl, Kāne, and Lau to the Board; and (ii) approval of executive compensation.

99. The 2021 Proxy Statement contained the following statements by Defendant Fargo, in relevant part:

> Board Oversight of ESG Strategy and Risk Management
>
> ***We firmly believe that effective management of ESG risks and opportunities creates a strategic advantage; improves the sustainability, well-being and resilience of our communities, our economy and our environment; and leads to sustained long-term value creation for our investors.***
>
> * * *

> In 2020, our Board fully integrated material ESG factors into the company's governance structures and oversight of management activities. We expanded the responsibilities of the Nominating & Corporate Governance Committee to include overseeing human capital management and ensuring all material ESG areas have appropriate oversight.
>
> * * *
>
> ***The new performance-based regulation (PBR) framework, developed with our regulators and stakeholders, further incentivizes the utility to achieve ESG outcomes*** relating to increasing renewable energy, facilitating customer participation in the clean energy transition, ***modernizing our grid*** and advancing affordability and customer equity. In doing so, PBR offers the utility the opportunity to earn additional revenue if it achieves performance targets – directly linking our financial performance with stakeholder outcomes.
>
> (Emphasis added.)

100. However, the 2021 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention plans and policies, the Company's procedures were inadequate to meet the challenges for which they were purportedly designed. Further, despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. If shareholders knew these facts then they would not have approved the above-solicited proposals.

101. On April 22, 2021, Hawaiian Electric issued a press release entitled "HEI RELEASES 2021 CONSOLIDATED ENVIRONMENTAL, SOCIAL AND GOVERNANCE (ESG) REPORT" which stated, in relevant part:

> Hawaiian Electric Industries, Inc. (HEI) (NYSE: HE) today released an updated consolidated report describing its policies, actions and performance with respect to a number of environmental, social and governance (ESG) matters, ***including climate-related risks and opportunities***.
>
> * * *
>
> "***With all of our operations in the middle of the Pacific Ocean, we know that our company's long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands. That's why***

> ***ESG and sustainability considerations are at the core of our mission to be a catalyst for a better Hawai'i,"*** said Connie Lau, HEI president and CEO.
>
> "Since issuing our inaugural ESG report last fall, we have continued our cross-enterprise ***work to further integrate ESG and climate-related factors into our governance, strategies, risk management and reporting***. This second consolidated ESG report provides an update on our ESG efforts and reflects our commitment to continuous improvement, transparency and accountability surrounding these very important issues," said Lau.

(Emphasis added.)

102. Also on April 22, 2021, Hawaiian Electric published its 2020 ESG Report. The 2020 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, and purported commitment to safety as discussed above.

103. On May 10, 2021, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended March 31, 2021 (the "1Q21 Report"). The 1Q21 Report was signed by Defendants Lau, Hazelton, Seu, and Sekimura. The 1Q21 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 1Q21 Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

104. On August 9, 2021, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended June 30, 2021 (the "2Q21 Report"). The 2Q21 Report was signed by Defendants Lau, Seu, Sekimura, and Hazelton. The 2Q21 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 2Q21 Report were SOX certifications signed by Defendants Lau,

Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

105. On November 5, 2021, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended September 30, 2021 (the "3Q21 Report"). The 3Q21 Report was signed by Defendants Lau, Hazelton, Seu, and Sekimura. The 3Q21 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 3Q21 Report were SOX certifications signed by Defendants Lau, Hazelton, Seu, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

106. On February 25, 2022, Hawaiian Electric filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by Defendants Hazelton, Sekimura, Seu, Kimura, Ito, Ajello, Burke, Connors, Dahl, Fargo, Flores, Fowler, Johns, Kāne, Pakkala, Russell, Scilacci, Taketa, and Taniguchi. The 2021 Annual Report contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed above.

107. Attached to the 2021 Annual Report were SOX certifications signed by Defendants Seu, Hazelton, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

108. On March 18, 2022 the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Fargo, Connors, Kāne, Dahl, Russell, Flores, Scilacci, Fowler, and Seu (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited, among other things: (i) the election of Defendants Fargo, Connors, Dahl, Flores, Kāne, Scilacci, and Seu to the Board; and (ii) approval of executive compensation.

109. The 2022 Proxy Statement contained the following statements by Defendant Fargo, in relevant part:

> **Board Oversight of Strategy and Risk Management**
>
> ***Effective management of risks and opportunities improves the sustainability, well-being and resilience of our communities, our state and our environment – and leads to sustained long-term value creation for our investors.***
>
> As a Board, we see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation. ***As a result, we deliberately composed our Board to ensure we have directors who have direct experience related to ESG topics, including renewable energy, climate change strategy and environmental management.***
>
> Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite. ***This includes risks relating to safety, other human capital considerations and climate change.***

(Emphasis added.)

110. The 2022 Proxy Statement also stated the following:

> **HEI — A Catalyst for Hawai'i's Vibrant Future**
>
> … Creating sustainable value for all of our stakeholders is what drives our ability to deliver sustainable, long-term value for shareholders. This principle is embedded in our core strategies:
>
> • **Hawaiian Electric** – Focused on achieving aggressive climate goals in a way that is affordable, reliable and resilient for our customers.

111. However, the 2022 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention plans and policies, the Company's procedures were inadequate to

meet the challenges for which they were purportedly designed. Further, despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. If shareholders knew these facts then they would not have approved the above-solicited proposals.

112. On April 12, 2022, Hawaiian Electric issued a press release entitled "HEI RELEASES 2022 CONSOLIDATED ENVIRONMENTAL, SOCIAL AND GOVERNANCE (ESG) REPORT" which stated, in relevant part:

> Hawaiian Electric Industries, Inc. (HEI) (NYSE: HE) today released its 2022 consolidated report describing its updated policies, actions and performance for full year 2021 with respect to a range of environmental, social and governance (ESG) matters, including climate-related risks and opportunities. This is HEI's third and most comprehensive ESG report.
>
> * * *
>
> "***Our ESG progress demonstrates our commitment not only to operating a sustainable business, but also to building a sustainable Hawai'i in which our children and grandchildren, our communities, our customers and our fellow employees will thrive together now and for generations to come***," said Scott Seu, HEI president and CEO. "Our company has been serving Hawai'i for over 130 years, and this deep-felt mindset comes naturally to us as a longstanding business in our island state. ***The alignment between ESG principles, state policy in Hawai'i, community expectations, and our goals as a company has never been stronger.***"
>
> (Emphasis added.)

113. That same day, Hawaiian Electric published its 2021 ESG Report. The 2021 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, and purported commitment to safety as discussed above.

114. The 2021 ESG Report discussed reliability and resilience, stating in relevant part:

**Managing Reliability and Resilience**

**Enhancing Resilience**

We are focused on ensuring the resilience of our system. Our efforts include:

• ***Using advanced climate risk modeling to access risks and inform our planning process***
• Deploying advanced meters and other technologies that allow us to respond more quickly to system interruptions
• ***Developing damage prediction modeling to estimate damage and outages from severe natural event scenarios in order to support resilience planning efforts***
• Developing plans for community microgrids and/or critical customer hubs to be able to quickly restore power to critical customers
• Building more modern and efficient power plants inland, away from the coastline.
…
• Collaborating with key partners, such as military, to supply energy to customers during an emergency
• Engaging with stakeholders to incorporate resilience needs and priorities through our Integrated Grid Planning process, including its Resilience Working Group.

* * *

***We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.*** We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines. We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

***We're working to reduce the impact of outages by adding devices to section off parts of the grid to reduce the number of customers affected by an outage.*** We have also completed distribution protection studies to improve safety and mitigate risk on each of the five islands we serve.

We measure and report reliability performance using metrics commonly used in the electric utility industry regarding the duration and frequency of power interruptions for customers.

Both the company (through performance incentives) and executives (through executive compensation goals) have financial incentives to promote strong reliability performance.

> We are working on a multi-year plan and PUC application focused on foundational investments in transmission and distribution system resilience. Our proposed plan will include:
>
> • ***Strengthening our most critical transmission lines to withstand extreme winds***
> • Hardening distribution lines serving critical community lifeline facilities such as hospitals, military sites, communications infrastructure, water and wastewater facilities, ports and emergency response facilities
> • Upgrading specific poles to improve restoration after a storm or hurricane
> • ***Moving lines underground in targeted areas prone to vegetation-related damage***
> • Removing large trees that are at risk of falling into lines during a storm
> • ***Strengthening lines and deploying devices to help prevent and respond to wildfires***
> • Installing equipment in select substations to reduce flood impacts.

(Emphasis added.)

115. The 2021 ESG Report also discussed wildfire prevention and mitigation, stating in relevant part:

> ***Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawai'i.*** 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. ***In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui***, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

(Emphasis added.)

116. On May 9, 2022, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended March 31, 2022 (the "1Q22 Report"). The 1Q22 Report was signed by Defendants Seu, Hazelton, Kimura, and Sekimura. The 1Q22 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 1Q22 Report were SOX certifications signed by Defendants

Seu, Hazelton, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

117. On August 8, 2022, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended June 30, 2022 (the "2Q22 Report"). The 2Q22 Report was signed by Defendants Seu, Ito, Kimura, and Sekimura. The 2Q22 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 2Q22 Report were SOX certifications signed by Defendants Seu, Ito, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

118. On November 7, 2022, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended September 30, 2022 (the "3Q22 Report"). The 3Q22 Report was signed by Defendants Seu, Ito, Kimura, and Sekimura. The 3Q22 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 3Q22 Report were SOX certifications signed by Defendants Seu, Ito, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

119. On February 27, 2023, Hawaiian Electric filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2022 (the "2022 Annual Report"). The 2022 Annual Report was signed by Defendants Ito, Sekimura, Seu, Kimura, Ajello, Burke, Connors, Dahl, Fargo, Flores, Fowler, Johns, Kāne, Kennedy, Kipp, Otani, Pakkala, Russell, Scilacci, Taketa, and

Taniguchi. The 2022 Annual Report contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles, as discussed above.

120. Attached to the 2022 Annual Report were SOX certifications signed by Defendants Seu, Ito, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

121. On March 24, 2023 the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Fargo, Connors, Kennedy, Dahl, Otani, Flores, Russell, Fowler, Scilacci, Kāne, and Seu (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited, among other things: (i) the election of Defendants Fargo, Connors, Dahl, Flores, Fowler, Kāne, Kennedy, Otani, Scilacci, and Seu to the Board; and (ii) approval of executive compensation.

122. The 2023 Proxy Statement contained the following statements by Defendant Fargo, in relevant part:

> **<u>Board Oversight of Strategy and Risk Management</u>**
>
> ***Effective management of risks and opportunities leads to sustained long-term value creation for our investors and improves the sustainability, well-being and resilience of our communities, our state and our environment.***
>
> Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite. ***This includes risks relating to a number of topics, including but not limited to, safety***, other human capital considerations ***and climate change***. …
>
> As a Board, we consider ESG-related strategies and risks in the context of our overall company strategies and risks. As such, we have integrated oversight of ESG risks and opportunities into our existing Board and committee responsibilities. ***In considering our Board composition, we also ensure we have directors who have direct experience related to ESG topics relevant to our strategies, including renewable energy, climate change strategy and environmental management.***

(Emphasis added.)

123. The 2023 Proxy Statement also stated the following, in relevant part:

> HEI's Enterprise Risk Management (ERM) function is principally responsible for identifying and monitoring risk at the holding company and its subsidiaries, and for reporting on high-risk areas to the Board and designated Board committees. ***As a result, all HEI directors, including those who serve on the Compensation & Human Capital Management Committee, are apprised of risks that could reasonably be expected to have a material adverse effect on HEI.***

(Emphasis added.)

124. However, the 2023 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention plans and policies, the Company's procedures were inadequate to meet the challenges for which they were purportedly designed. Further, despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. If shareholders knew these facts then they would not have approved the above-solicited proposals.

125. On April 4, 2023, Hawaiian Electric issued a press release entitled "HEI RELEASES LATEST CONSOLIDATED ENVIRONMENTAL, SOCIAL AND GOVERNANCE (ESG) REPORT" which stated, in relevant part:

> Hawaiian Electric Industries, Inc. (HEI) (NYSE: HE) today announced the publication of its newest consolidated report describing its updated policies, actions and performance for 2022 with respect to a range of environmental, social and governance (ESG) matters. This is HEI's fourth annual ESG report.
>
> "***Our HEI family of companies is guided by a common purpose to create a better Hawai'i – one that is thriving economically, environmentally***, culturally and socially," said Scott Seu, HEI president and CEO. "We believe this purpose serves the long-term interests of all of our stakeholders – it inspires us to act in ways that allow us not simply to advance, but to leap forward into a future that's brighter for us all."
>
> The theme of HEI's latest ESG report is "Laulima," which translates to "many hands working together." The report details the work of all of the HEI companies in 2022 toward their common purpose, including in areas such as decarbonization; economic

> health and affordability; reliability and resilience diversity, equity and inclusion; and human capital management.

(Emphasis added.)

126. Also on April 4, 2023, Hawaiian Electric released its 2022 ESG Report. The 2022 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, purported commitment to safety, reliability and resilience, and wildfire prevention and mitigation, as discussed above.

127. The 2022 ESG Report also stated the following regarding wildfire prevention and mitigation:

> **Wildfire prevention & mitigation**
>
> ***Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawai'i.*** Over 98% of wildfires are human caused and the threat to communities is high year-round. ***We joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas.***
>
> As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

(Emphasis added.)

128. On May 9, 2023, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended March 31, 2023 (the "1Q23 Report"). The 1Q23 Report was signed by Defendants Seu, Ito, Kimura, and Sekimura. The 1Q23 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 1Q23 Report were SOX certifications signed by Defendants Seu,

Ito, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

129. On August 7, 2023, Hawaiian Electric filed a periodic report on Form 10-Q with the SEC for the quarter ended June 30, 2023 (the "2Q23 Report"). The 2Q23 Report was signed by Defendants Seu, Ito, Kimura, and Sekimura. The 2Q23 Report contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed above. Attached to the 2Q23 Report were SOX certifications signed by Defendants Seu, Ito, Kimura, and Sekimura attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

130. The above-referenced statements were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate; (ii) the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the Company did not properly maintain its equipment; (iv) as a result of the foregoing, Maui and its residents were at risk of extreme fire risk which Defendants exacerbated; (v) as a result of the foregoing, the Company was at extreme financial, regulatory, legal, and reputational risk due to a its failures and any fire; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

***The Truth Emerges***

131. On August 8, 2023, wildfires broke out in Maui when power lines belonging to Hawaiian Electric fell down in high winds, ultimately leading to over 100 deaths[6] and billions of dollars in property damage and costs.[7] The August 2023 Maui wildfires are the deadliest in the United States in over 100 years.

132. The Individual Defendants' false and misleading statements became apparent with the August 2023 Maui wildfires. Prior to these wildfires, the Individual Defendants knew Hawaiian Electric's policies, procedures, protocols, and abilities were inadequate. Despite that, the Individual Defendants failed to take any action even to make the Company's procedures, protocols, and abilities merely adequate. As such, the Individual Defendants placed Maui and its residents at a heightened risk of wildfires and their destruction.

133. On August 12, 2023, following extensive coverage of the devastating fires on Maui, news outlets began reporting that Hawaiian Electric did not have a plan to shut off power in advance of the Hawaii wildfires. The Individual Defendants knew that shutting off the power in advance of the impending powerful winds would prevent a wildfire and destruction. For instance, an article entitled "Hawaii utility faces scrutiny for not cutting power to reduce fire risks," by the *The Washington Post* stated:

> ***Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would trigger dangerous fire conditions across much of the island and Hawaii.***

---

[6] "Death Toll of Maui Wildfire Rises to 101: A new report released by the Maui Police Department this month revealed that a large number of victims had died along a single street.", Jacey Fortin and Adeel Hassan, *The New York Times*, February 13, 2024, https://www.nytimes.com/article/maui-wildfire-victims.html.

[7] U.S. Billion-Dollar Weather & Climate Disasters 1980-2023, NOAA National Centers for Environmental Information. https://web.archive.org/web/20230911184100/https://www.ncei.noaa.gov/access/billions/events.pdf

> The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.
>
> Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.
>
> ***Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans***, according to the company and two former power and energy officials interviewed by *The Washington Post*. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences.
>
> The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.
>
> "They were not as proactive as they should have been," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire." Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."
>
> Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. ***He confirmed that some electrical lines were energized when they hit the ground.***
>
> (Emphasis added.)

134. On this news, Hawaiian Electric's stock price fell $10.94 per share, or 33%, to close at $21.46 per share on August 14, 2023.

135. Then, on August 16, 2023, *The Wall Street Journal* published an article entitled "Hawaiian Electric Is in Talks With Restructuring Firms." The article stated in part:

> Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires, said people familiar with the matter.
>
> ***Hawaiian Electric is facing a sell off in its stock and bonds, and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered.***
>
> The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.
>
> On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts— the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."
>
> ***More customer lawsuits are expected in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.***
>
> ***S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment of the company's customer base and will take many years to restore. S&P also said that wildfire lawsuits seeking compensation for injuries, deaths and property damage will weigh on the company's credit quality.***
>
> (Emphasis added.)

136. On August 17, 2023, *The Wall Street Journal* published an article entitled "Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act: Four years ago, the utility said it needed to do more to prevent its power lines from emitting sparks. It made little progress, focusing on a shift to clean energy." The article stated, in relevant part:

> During the 2019 wildfire season, one of the worst Maui had ever seen, Hawaiian Electric concluded that it needed to do far more to prevent its power lines from emitting sparks.
>
> The utility examined California's plans to reduce fires ignited by power lines, started flying drones over its territory and vowed to take steps to protect its equipment and its customers from the threat of fire.

***Nearly four years later, the company has completed little such work. Between 2019 and 2022, it invested less than $245,000 on wildfire-specific projects on the island, regulatory filings show.*** It didn't seek state approval to raise rates to pay for broad wildfire-safety improvements until 2022, and has yet to receive it.

***Now, the company is facing scrutiny, litigation and a financial crisis over indications that its power lines might have played a role in igniting the deadliest U.S. wildfire in more than a century. The blaze has caused at least 110 deaths destroyed the historic town of Lahaina and resulted in an estimated billions of dollars in damage.***

The fire's cause hasn't been determined, but mounting evidence suggests the utility's equipment was involved. One video taken by a resident shows a downed power line igniting dry grass along a road near Lahaina. A firm that monitors grid sensors reported dozens of electrical disruptions in the hours before the fire began, including one that coincided in time with video footage of a flash of light from power lines.

Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.

"We all believe it's important to understand what happened. And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.

In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment. It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.

The utility has long been a force in Hawaii politics and business. ***In the wake of the fire, its finances are reeling. Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.***

* * *

At the end of 2019, Hawaiian Electric issued a press release about wildfire risk. It said it would install heavier, insulated conductors on Maui and Oahu to minimize the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

> In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

(Emphasis added.)

137. On this news, Hawaiian Electric's stock price fell $2.54 per share, or 17%, to close at $12.03 per share on August 17, 2023.

138. On August 18, 2023, *The Wall Street Journal* published an article entitled "Hawaii Fires Turn a Safe Investment Into a Big Risk" which stated, in relevant part:

> Investors in recent days have fled Hawaiian Electric Industries [] parent company of a utility by the same name, as victims scrutinize its role in last week's blaze. A selloff in the utility's stock has hammered its share price 63% lower since Aug. 7, while bondholders have unloaded the company's debt at steep discounts.
>
> Investigators haven't pinpointed the cause of the fire that killed more than 100 people and reduced much of the oceanside town of Lahaina to ash. ***But mounting evidence suggests the utility's equipment was involved. Some survivors have filed lawsuits accusing Hawaiian Electric of negligence***, alleging the company heightened the threat in part by running electricity through power lines as high winds swept across Maui.
>
> ***The company has begun consulting with restructuring advisers***, The Wall Street Journal reported.
>
> Hawaiian Electric Chief Executive Shelee Kimura said at a news conference Monday that ***the company doesn't have an automatic shut-off plan that some other utilities use to limit fire risk***.
>
> * * *
>
> In 2018, a downed power line in a drought-stricken California forest set off a blaze that leveled the town of Paradise and killed dozens. The incident helped drive [Pacific, Gas & Electric Company ("PG&E")] into bankruptcy and saddled it with a $13.5 billion settlement with victims, upending how investors evaluate a sector traditionally seen as a safe bet.
>
> "What has happened now for these utilities is there is heightened risk that really goes against what investors want," said Neil Kalton, an analyst at Wells Fargo.

> ***Researchers have for years warned about growing fire risks in Hawaii and elsewhere, as a warming climate boosts the frequency and magnitude of conditions that spread such blazes.***
>
> With tracts of increasingly dry grass or woodlands acting as kindling, investigators and victims' lawyers have at times pointed to fallen transmission lines as sparking fires. In June, an Oregon jury found power company PacifiCorp liable for at least $90 million in damages from a 2020 fire, ruling that it had negligently failed to limit risks.
>
> Analysts say the company's total costs could balloon as the class-action suit involving thousands of additional plaintiffs concludes. PacifiCorp, which is owned by Berkshire Hathaway, said it "will vigorously pursue appeals and are confident that we will prevail."
>
> ***The fear of massive payouts has led investors to increasingly push for upgrades, such as underground transmission lines, to sometimes aging infrastructure.*** That spending by utilities across the country, coupled with renewable energy build-outs, ultimately means large bills for ratepayers.
>
> "There's obviously been more and more focus on these infrastructure investments given the weather environment," said Andrew Bischof, an equity strategist at Morningstar.
>
> ***Hawaiian Electric has been slow to complete such work despite warning in 2019 that it needed to do more.***

(Emphasis added.)

139. As a result of the foregoing, the Company's share price fell precipitously from a Relevant Period high of $55.15 on March 18, 2020 to $9.06 on August 25, 2023, *representing an over 80% decrease in the Company's share price* as a result of the wrongdoing as alleged herein.

***The Individual Defendants' Knowledge***

140. Throughout the Relevant Period, the Individual Defendants knew that Hawaiian Electric's wildfire prevention and safety protocols, procedures, policies, and abilities were inadequate. Despite knowing the risks that wildfires posed to Maui and its residents, and that those risks were growing, the Company's inadequate safety protocols, procedures, policies, and abilities placed Maui at a heightened, and now realized, risk of devastating wildfires. Despite this, the

Individual Defendants continued to issue the above false and misleading statements and failed to state facts necessary to make their statements not false and misleading.

141. The Individual Defendants knew that the Company's infrastructure was in need of repair and modernization throughout the Relevant Period. The Individual Defendants knew that without repair and updates the Maui wildfire disaster would occur.

142. The Individual Defendants also knew that the Company did not use wildfire prevention technologies on its T&D components—such as covered conductors, underground powerlines, composite powerlines, and non-expulsion fuses, thus increasing the risk of causing a wildfire.

143. The Individual Defendants also knew that *the Company had already caused wildfires on Maui*. Moreover, the Individual Defendants knew or should have known of previous highly publicized wildfires caused by other electrical utility companies across the country, including, but not limited to, PG&E and Southern California Edison ("SoCal Edison" or "SCE") in California and PacifiCorp in Oregon.

144. Indeed, *The Maui News*, via the *The Associated Press*, published an article entitled "Bare electrical wires, leaning power poles in West Maui were possible cause of fires" on August 28, 2023, which re-publicized, among other things, that:

> Videos and images analyzed by ***The Associated Press confirmed those wires were among miles of line that Hawaiian Electric Co. left naked to the weather and often-thick foliage, despite a recent push by utilities in other wildfire- and hurricane-prone areas to cover up their lines or bury them.***
>
> ***Compounding the problem is that many of the utility's 60,000, mostly wooden power poles, which its own documents described as built to "an obsolete 1960s standard," were leaning and near the end of their projected lifespan. They were nowhere close to meeting a 2002 national standard that key components of Hawaii's electrical grid be able to withstand 105 mile per hour winds.***

A 2019 filing said it had fallen behind in replacing the old wooden poles because of other priorities and warned of a *"serious public hazard"* if they *"failed."*

Google street view images of poles taken before the fire show the bare wire.

It's *"very unlikely"* a fully-insulated cable would have sparked and caused a fire in dry vegetation, said Michael Ahern, who retired this month as director of power systems at Worcester Polytechnic Institute in Massachusetts.

***Experts who watched videos showing downed power lines agreed wire that was insulated would not have arced and sparked, igniting a line of flame.***

Hawaiian Electric said in a statement that it has *"long recognized the unique threats"* from climate change and has spent millions of dollars in response, but did not say whether specific power lines that collapsed in the early moments of the fire were bare.

* * *

But a former member of the Hawaii Public Utilities Commission confirmed many of Maui's wooden power poles were in poor condition. Jennifer Potter lives in Lahaina and until the end of last year was on the commission, which regulates Hawaiian Electric.

"Even tourists that drive around the island are like, 'What is that?' They're leaning quite significantly because the winds over time literally just pushed them over," she said. "***That obviously is not going to withstand 60, 70 mile per hour winds. So the infrastructure was just not strong enough for this kind of windstorm … The infrastructure itself is just compromised***."

* * *

***Hawaiian Electric also faces criticism for not shutting off the power amid high wind warnings and keeping it on even as dozens of poles began to topple.*** Maui County sued Hawaiian Electric on Thursday over this issue.

* * *

Insulating an electrical wire prevents arcing and sparking, and dissipates heat.

Other utilities have been addressing the issue of bare wire. Pacific Gas & Electric was found responsible for the 2018 Camp Fire in northern California that killed 85 people. The disaster was caused by downed power lines.

Its program to eliminate uninsulated wire in fire zones has covered more than 1,200 miles of line so far.

PG&E also announced in 2021 it would bury 10,000 miles of electrical line. It buried 180 miles in 2022 and is on pace to do 350 miles this year.

Another major California utility, Southern California Edison, expects to have replaced more than 7,200 miles, or about 75 percent of its overhead distribution lines, with covered wire in high fire risk areas by the end of 2025. It, too, is burying line in areas at severe risk.

***Hawaiian Electric said in a filing last year that it had looked to the wildfire plans of utilities in California.***

* * *

***As for the poles, in a 2019 Hawaiian Electric regulatory document, the company said its 60,000 poles, nearly all wood, were vulnerable because they were already old and Hawaii is in a "severe wood decay hazard zone."*** The company said it had fallen behind in replacing wood poles because of other priorities and warned of a "serious public hazard" if the poles "failed."

***The document said many of the company's poles were built to withstand 56 mph (90 kph), when a Category 1 Hurricane has winds of at least 74 mph.***

***In 2002, the National Electric Safety Code was updated to require utility poles like those on Maui to withstand 105 mile per hour winds.***

* * *

"Everyone considers Hawaii to be a tropical paradise, but it got dry and it burned," [Joshua Rhodes, an energy systems research scientist at the University of Texas at Austin] said Thursday. "***It may look expensive if you're doing work to stave off starting wildfires or the impact of wildfires, but it's much cheaper than actually starting one and burning down so many people's homes and causing so many people's deaths.***"

(Emphasis added.)

145. Defendants underfunded Hawaiian Electric's wildfire projects during the Relevant Period, spending only $245,000 on such projects between 2019 and 2022. In essence, the Individual Defendants neglected wildfire prevention and increased the severity and risk of a wildfire occurring while falsely and misleadingly touting that the Company was addressing safety issues in its public filings and statements.

146. The Individual Defendants were made aware of, or should have been aware of, the link between hurricanes and wildfires caused by T&D components. Indeed, weather from Hurricane Dora was impacting Maui on August 8, 2023.

147. Importantly, Defendants knew that other utility companies created and utilized power shutoff systems to protect against wildfires in high winds—exactly what happened on Maui in August 2023. However, Defendants failed to create or implement such a system.

148. The Individual Defendants knew, or should have known, that the Company must follow various standards to protect the public from the consequences that follow from vegetation coming into contact with its T&D components, pursuant to Hawaii Revised Statutes § 6-73-11. Indeed, the Company was required to maintain the areas near certain of its T&D components and ensure sufficient clearance around its power lines. Additionally, HRS § 6-73-14 provides that any maintenance issues not specifically addressed by HRS § 6-73-11 "should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the construction or maintenance." The Individual Defendants failed to cause the Company to comport with those standards thus placing the public at a heightened risk of wildfires and severe wildfires.

149. The Individual Defendants knew that in the days leading up to the August 2023 Maui wildfires that Maui had been in a drought. The Individual Defendants also knew of inclement weather in the area, in part due to Hurricane Dora. Despite this, the Individual Defendants failed act safely—including to shut off power in advance of the high winds on August 8, 2023.

150. At all relevant times, the Individual Defendants knew or should have known at least all of the above facts. However, the Individual Defendants failed to maintain adequate systems, controls, and programs to prevent wildfires, failed to adequately maintain their T&D components,

failed to comply with or cause the Company to comply with minimum safety standards, and failed to prevent the destructive August 2023 wildfires in Maui. Meanwhile, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate; (ii) the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the Company did not properly maintain its equipment; (iv) as a result of the foregoing, Maui and its residents were at risk of extreme fire risk which the Individual Defendants exacerbated; (v) as a result of the foregoing, the Company was at extreme financial, regulatory, legal, and reputational risk due to a its failures and any fire; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

***The Outcome***

151. The wildfires Hawaiian Electric caused devastated Lahaina and other parts of Maui and its residents.

152. Following the Maui wildfires caused by Hawaiian Electric, the Individual Defendants continued to breach their fiduciary duties to the Company. In particular, the Individual Defendants caused the Company to remove the fallen and damaged T&D components from nearby a power station in Lahaina around August 12, 2023. At the time, however, the Individual Defendants knew that investigators from the States Bureau of Alcohol, Tobacco, Firearms, and Explosives (sometimes referred to as "BATFE" or the "ATF") had not conducted their investigation into the Maui wildfires. Accordingly, the T&D components should not have been removed until after the investigations were conducted.

153. The failure to preserve evidence was a breach of their fiduciary duties because the Individual Defendants knew that failing to preserve evidence could subject Hawaiian Electric to

fines and penalties. The Individual Defendants knew of such fines as in 2022, the Company had discussed the $15 billion settlement by PG&E for starting a wildfire and failing to preserve the evidence.

154. The reputational impact spread far beyond Hawaiian Electric's Hawaiian customer base. For instance, the National Football League honored the Lahainaluna High School football team and its response to the Maui wildfires in connection with and *at* the Super Bowl in February 2024.[8]

**DAMAGE TO THE COMPANY**

155. As a direct and proximate result of the Individual Defendants' conduct, Hawaiian Electric has expended and will continue to expend significant sums of money.

156. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the many current actions against the Company, including but not limited to the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

158. As a direct and proximate result of the Individual Defendants' conduct, Hawaiian Electric has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

---

[8] "High school football players, survivors of Maui wildfires, are honored at Super Bowl", Emma Bowman, *National Public Radio*, February 11, 2024. https://www.npr.org/2024/02/11/1230736266/super-bowl-lahainaluna-maui-wildfires.

discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

159. Additionally, as a result of the Individual Defendants' failures to maintain or improve safety protocols, controls, policies, and abilities the Company is now subject to regulatory and governmental investigations and actions. Due to actual and potential investigations and actions, the Company has and will have to expend significant sums on complying with investigations, defending itself and certain affiliates, and on any penalties or fines that may result.

160. The Company is also facing numerous personal injury and property damage lawsuits as well as the Maui County action. With these and potential further litigation, the Company will expend significant resources on litigation.

161. Further, at all relevant times, the Individual Defendants received lucrative compensation from Hawaiian Electric.

162. Furthermore, Hawaiian Electric revealed in a PUC filing that it had only $165 million in annual general liability insurance and $25 million in professional liability insurance. Those funds would cover only a small fraction of the potential liability that the Company faces from its myriad legal and regulatory actions—and those may grow. As such, Hawaiian Electric will be unable to rely on insurance coverage for immense sums of damages and penalties and thus may have to expend significant sums on its own further damaging the Company.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

163. Plaintiff brings this action derivatively and for the benefit of Hawaiian Electric to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of the Company and violations of Sections 10(b) and 20(a) of the Exchange Act, and to seek contribution for violations of Section 21D of the Exchange

Act. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164. HEI and HECO are named solely as nominal parties in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

165. Plaintiff is a current shareholder of Hawaiian Electric and was a continuous shareholder of the Company during the Relevant Period. Plaintiff will adequately and fairly represent the interests of Hawaiian Electric in enforcing and prosecuting its rights, and, to that end, has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

166. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

167. A pre-suit demand on the HEI Board and the HECO Board (and with the HEI Board, the “Boards”) is futile and, therefore, excused.

168. At the time of filing of this complaint, the HEI Board consists of the following seven individuals: Defendants Ford, Seu, Connors, Flores, Fowler, Kāne, and Scilacci (the “HEI Director Defendants”). Plaintiff needs only to allege demand futility as to four of the HEI Director Defendants that were on the Board at the time of the filing of this complaint.

169. At the time of filing of this complaint, the HECO Board consists of the following six individuals: Defendants Johns, Kimura, Ajello, Kipp, Pakkala, and Taniguchi (the “HEI Director Defendants”). Plaintiff needs only to allege demand futility as to three of the HECO Director Defendants that were on the Board at the time of the filing of this complaint.

170. All directors served on the Boards during the period during which the Companies engaged in, authorized, or ignored the wrongdoing alleged in this Complaint. Accordingly, Plaintiff

must show that a majority of each Board, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute it.

171. Indeed, each of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they each face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

172. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

173. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing Hawaiian Electric to engage the misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, among other malfeasance, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and therefore excused.

174. Additional reasons that demand on Defendant Seu is futile follow. Defendant Seu is not disinterested or independent, and therefore, is incapable of considering demand because he, as President and CEO, is an employee of the Company who derives substantial income from his

employment with Hawaiian Electric. Additionally, Defendant Seu is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the myriad other cases and investigations related to this conduct—including the Securities Class Action. As a Company director and officer, Defendant Seu conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Seu signed and personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-Ks and the quarterly reports on the Form 10-Qs as alleged above. Therefore, Defendant Seu breached his fiduciary duties and faces and substantial likelihood of liability. Defendant Seu solicited the 2022 and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board and had his executive compensation approved as a result. Therefore, Defendant Seu breached his fiduciary duties and faces a substantial likelihood of liability.

175. Additional reasons that demand on Defendant Fargo is futile follow. Defendant Fargo signed and personally made the false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022 10-Ks. Therefore, Defendant Fargo breached his fiduciary duties and faces and substantial likelihood of liability. Defendant Fargo also solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board. In connection with his role as a Company director, Defendant Fargo receives substantial income. Defendant Fargo breached his fiduciary duties and faces a substantial likelihood of liability. Defendant Fargo also has a longstanding relationship with Defendant Ajello—he currently serves as a Senior Advisor at SKAI Ventures and Defendant Ajello has served on the Board of SKAI

Ventures since 2015. Therefore, Defendants Fargo and Ajello work and have worked together and built a business relationship while at SKAI Ventures.

176. Additional reasons that demand on Defendant Connors is futile follow. Defendant Connors signed and personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-Ks. Therefore, Defendant Connors breached her fiduciary duties and faces and substantial likelihood of liability. Defendant Connors solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board. In connection with her role as a Company director, Defendant Connors receives substantial compensation. According to the Company's 2023 Proxy Statement, the Company and its subsidiaries made charitable contributions to nonprofit organizations where Defendant Connors serves as an executive officer. Therefore, Defendant Connors is not independent as she could not reasonably consider a demand to sue the directors of the Company from which her nonprofit receives donations and risk not receiving those similar contributions again in the future.

177. Additional reasons that demand on Defendant Flores is futile follow. Defendant Flores signed and personally made the false and misleading statements contained in the 2021 and 2022 10-Ks. Therefore, Defendant Flores breached her fiduciary duties and faces and substantial likelihood of liability. Flores solicited the 2022 and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. In connection with her role as a Company director, Defendant Flores receives substantial income.

178. Additional reasons that demand on Defendant Fowler is futile follow. Defendant Fowler signed and personally made the false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022 10-Ks. Therefore, Defendant Fowler breached her fiduciary duties and faces and substantial likelihood of liability. Defendant Fowler solicited the 2019, 2020, 2021, 2022,

and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. In connection with her role as a Company director, Defendant Fowler receives substantial income. Defendant Fowler purports to possess expertise in the "Utility/Energy Industry," having previously served on the Board of Portland General Electric. As a result, Defendant Fowler knew or should have known the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. However, Defendant Fowler failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that Hawaiian Electric operated safely and soundly. As a result of her failures, despite her purported knowledge and expertise, Defendant Fowler faces a substantial likelihood of liability.

179. Additional reasons that demand on Defendant Kāne is futile follow. Defendant Kāne signed and personally made the false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022 10-Ks. Therefore, Defendant Kāne breached his fiduciary duties and faces and substantial likelihood of liability. Defendant Kāne solicited the 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. In connection with his role as a Company director, Defendant Kāne receives substantial income. According to the Company's 2023 Proxy Statement, the Company and its subsidiaries made charitable contributions to nonprofit organizations where Defendant Kāne serves as executive officer. Therefore, Defendant Kāne is not independent as he could not reasonably consider a demand to sue the directors of the Company from which his nonprofit receives donations and risk not receiving those similar contributions again in the future. Defendant Kāne also has a longstanding relationship with Defendant Kimura. Since 2009, Defendant Kāne has been a Trustee of Kamehameha Schools—while Defendant Kimura serves on the Audit Committee of

Kamehameha Schools. Thus, Defendants Kāne and Kimura work and have worked together and built a business relationship while at Kamehameha Schools. Therefore, Defendants Kāne and Kimura are incapable of considering a demand to sue each other.

180. Additional reasons that demand on Defendant Scilacci is futile follow. Defendant Scilacci signed and made the false and misleading statements contained in the 2019, 2020, 2021, and 10-Ks. Therefore, Defendant Scilacci breached his fiduciary duties and faces and substantial likelihood of liability. Scilacci solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. In connection with his role as a Company director, Defendant Scilacci receives substantial income. Defendant Scilacci purports to possess expertise in the "Utility/Energy Industry," having previously held positions within SoCal Edison, including Senior Vice President and CFO. Indeed, Defendant Scilacci is touted as "one of the top CFOs in the electric utility sector." Therefore, Defendant Scilacci knew the hazards and risks inherent to the energy sector and posed by Hawaiian Electric. However, Defendant Scilacci failed to ensure that the Company maintained its T&D components properly, complied with safety standards, engaged in wildfire prevention, and that the Company operated in a safe and sound manner. Therefore, despite his purported advanced knowledge and expertise, Defendant Scilacci faces a substantial likelihood of liability.

181. Additional reasons that demand on Defendant Kimura is futile follow. Defendant Kimura not disinterested or independent, and therefore, is incapable of considering demand because she, as President and CEO, is an employee of the Company and derives substantially all of her income from her employment with Hawaiian Electric. Accordingly, Defendant Kimura is not independent from Defendants Fargo, Flores, Fowler, and Kāne as they comprise the Compensation Committee and are responsible for evaluating and determining executive compensation and

benefits. Because of her status as an inside director, and the concomitant substantial compensation she receives, Defendant Kimura could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for her financial future. Additionally, Defendant Kimura signed and personally made the false and misleading statements contained in the 2021 and 2022 10-Ks and the quarterly reports filed on Form 10-Qs as alleged above. Therefore, Defendant Kimura breached her fiduciary duties and faces and substantial likelihood of liability. Defendant Kimura also has a longstanding relationship with Defendant Kāne. Defendant Kimura presently serves on the Audit Committee of Kamehameha Schools—Defendant Kāne is currently a Trustee of Kamehameha Schools. Therefore, Defendants Kimura and Kāne work and have worked together and built a business relationship while at Kamehameha Schools. As a result, Defendants Kimura and Kāne are incapable of considering a demand to sue each other.

182. Additional reasons that demand on Defendant Johns is futile follow. During the Relevant Period, Defendant Johns served as Chair of HECO's Audit Committee and therefore had certain additional duties. Those additional duties include assisting the Board with oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. However, Defendant Johns failed to fulfil those duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing alleged throughout this complaint. Defendant Johns abandoned his duties and faces a substantial likelihood of liability. Defendant Johns signed and personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-Ks. Therefore, Defendant Johns breached his fiduciary duties and faces and substantial

likelihood of liability. In connection with his role as a Company director, Defendant Johns receives substantial income.

183. Additional reasons that demand on Defendant Ajello is futile follow. Defendant Ajello signed and personally made the false and misleading statements contained in the 2020, 2021, and 2022 10-Ks. Therefore, Defendant Ajello breached his fiduciary duties and faces and substantial likelihood of liability. In connection with his role as a Company director, Defendant Ajello receives substantial income. Defendant Ajello also has a longstanding relationship with Defendant Fargo. Defendant Ajello has served on the Board of SKAI Ventures since 2015. Defendant Fargo also currently serves as a Senior Advisor at SKAI Ventures. Therefore, Defendants Ajello and Fargo work and have worked together and built a business relationship while at SKAI Ventures. Therefore, Defendants Ajello and Fargo are incapable of considering a demand to sue each other.

184. Additional reasons that demand on Defendant Kipp is futile follow. Defendant Kipp signed and personally made the false and misleading statements contained in the 2022 10-K. Therefore, Defendant Kipp breached her fiduciary duties and faces and substantial likelihood of liability. In connection with her role as a Company director, Defendant Kipp receives substantial income.

185. Additional reasons that demand on Defendant Pakkala is futile follow. Defendant Pakkala signed and personally made the false and misleading statements contained in the 2020, 2021, and 2022 10-Ks. Therefore, Defendant Pakkala breached her fiduciary duties and faces and substantial likelihood of liability. In connection with her role as a Company director, Defendant Pakkala receives substantial income. According to the Company's Exhibit 99.1 attached to the 2023 Annual Report, entities in which Defendant Pakkala or her family members have an ownership

interest engaged in business with American Savings Bank—a wholly owned subsidiary of the Company. Further, Defendants Seu, Dahl, and Otani serve on the American Savings Bank Board together. As a result of this business entanglement, Defendant Pakkala is not independent from the Company nor Defendants Seu, Dahl, and Otani and could not reasonably consider a demand to sue these directors.

186. Additional reasons that demand on Defendant Taniguchi is futile follow. Defendant Taniguchi signed and personally made the false and misleading statements contained in the 2021 and 2022 10-Ks. Therefore, Defendant Taniguchi breached his fiduciary duties and faces and substantial likelihood of liability. In connection with his role as a Company director, Defendant Taniguchi receives substantial income.

187. Hawaiian Electric has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Hawaiian Electric any part of the damages the Company suffered and will continue to suffer. Thus, any demand upon the Director Defendants would be futile.

188. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty (to the extent such a exculpations could exist). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

189. The acts complained of herein constitute violations of fiduciary duties owed by Hawaiian Electric's directors and officers, and these acts are incapable of ratification.

190. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hawaiian Electric. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, among other things, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Hawaiian Electric, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

191. If there is no (remaining or applicable) directors' and officers' liability insurance, then the Director Defendants will not cause Hawaiian Electric to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the HEI Director Defendants and three of the HECO Directors Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Individual Defendants**

193. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194. The Individual Defendants participated in scheme to defraud with the purpose and effect of defrauding Hawaiian Electric. Not only is Hawaiian Electric now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Hawaiian Electric by the Individual Defendants.

195. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, proxy statements, and periodic and current reports filed with the SEC.

196. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hawaiian Electric not misleading.

197. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did

control the conduct complained of herein and the content of the public statements disseminated by Hawaiian Electric.

198. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

199. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. The Individual Defendants, by virtue of their positions with Hawaiian Electric and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hawaiian Electric and each of its controlling shareholder, officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Hawaiian Electric to engage in the illegal conduct and practices complained of herein.

202. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

**COUNT III**

**Contribution Under Section 10(b) and 21D of the Exchange Act Against the Defendants Lau, Seu, Hazelton, and Ito**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204. Hawaiian Electric and Defendants Lau, Seu, Hazelton, and Ito are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lau, Seu, Hazelton, and Ito willful and/or reckless violations of their obligations as officers and/or directors of Hawaiian Electric.

205. Defendants Lau, Seu, Hazelton, and Ito because of their positions of control and authority as directors and/or officers of Hawaiian Electric, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hawaiian Electric, including the wrongful acts complained of herein and in the Securities Class Action.

206. Accordingly, Defendants Lau, Seu, Hazelton, and Ito are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

207. As such, Hawaiian Electric is entitled to receive all appropriate contribution or indemnification from Defendants Lau, Seu, Hazelton, and Ito.

**COUNT IV**

**Breaches of Fiduciary Duties**

**Against the Individual Defendants**

208. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hawaiian Electric's business and affairs.

210. Each of the Individual Defendants violated and breached the fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision owed.

211. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hawaiian Electric.

212. In breach of their fiduciary duties owed to Hawaiian Electric, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, among other things, that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate; (ii) the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the Company did not properly maintain its equipment; (iv) as a result of the foregoing, Maui and its residents were at risk of extreme fire risk which Defendants exacerbated; (v) as a result of the foregoing, the Company was at extreme financial, regulatory, legal, and reputational risk due to a its failures and any fire; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

213. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

214. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hawaiian Electric has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**

**Against the Individual Defendants**

217. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hawaiian Electric.

219. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Hawaiian Electric that was tied to the performance or artificially inflated valuation of Hawaiian Electric or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

220. Plaintiff, as a shareholder and a representative of Hawaiian Electric, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

221. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

**COUNT VI**

**Gross Mismanagement**

**Against the Individual Defendants**

222. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hawaiian Electric in a manner consistent with the operations of a publicly held corporation.

224. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hawaiian Electric has sustained and will continue to sustain significant damages and harm.

225. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

226. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

**COUNT VII**

**Waste of Corporate Assets**

**Against the Individual Defendants**

227. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

229. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hawaiian Electric to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries by the governmental authorities, to lose financing from investors, and to face numerous lawsuits.

230. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

231. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

**COUNT VIII**

**Abuse of Control**

**Against the Individual Defendants**

232. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hawaiian Electric, for which they are legally responsible.

234. As a direct and proximate result of the Individual Defendants' abuse of control, Hawaiian Electric has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Hawaiian Electric has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235. Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Individual Defendants as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for and to disgorge all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Date: February 28, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# VERIFICATION

I, Alexander Tai am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. 2/23/2024

DocuSigned by:

4B6352420AAD4E2...

Alexander Tai